Mr. Fitzgerald. Thank you, Your Honor. May it please the court. Matt Fitzgerald on behalf of Cook County and the Sheriff's Office. This is a Rule 23 F appeal, and the sole issue is class certification. The class is about 1,900 female employees at the Cook County Jail. And this class includes the vast overwhelming majority of all non-supervisor, non-clerk, and non-clerk employees. Female employees at one of the largest jail complexes in this country. The class claim is that all of these 1,900 women uniformly suffered a hostile workplace environment caused by misconduct by the male inmates. And this class is relatively unique. The plaintiff's brief doesn't cite, and I'm not aware of, any other case certifying a large class of jail employees based on misconduct by the inmates. This court should reverse the class certification. And the core reason is that the class members here had vastly different experiences. The district court used ambient harassment as an umbrella, essentially, to bring within meaningfully different experiences had by class members working in all different parts of this enormous jail complex. And that was error. Dr. Fitzgerald defined ambient harassment as, quote, harassment that extends beyond the focal individual to affect the entire work group. And she meant, in this context, nearly 2,000 employees at the Cook County Jail. And so when the defense said, well, but how are these women who worked in all these different places going to show a common question on, say, severity or pervasiveness? How are they going to prove all of that in one stroke? The court said, well, ambient harassment is the common characteristic of the class. And whether ambient harassment suffered by these female employees is a common question, will be a common question, making class-wide resolution possible. Mr. Fitzgerald, this is Judge Bikes. If I could ask an antecedent question about the basis for this ambient harassment theory. I am having some difficulty understanding the district judge's ruling on that theory, insofar as the class certification issue, because he excluded Dr. Fitzgerald's opinion testimony as it relates to the Cook County Jail itself, based on unreliability of the methodology, as I understand the ruling. But there's a footnote later in the opinion when the judge gets into the substance of the class certification decision, saying that her opinions are admissible on the broader theory of ambient harassment. And there was never any 702 analysis on the admissibility of that, her opinions on that theory, that whole ambient harassment theory as a scientific matter, and whether it's scientifically reliable or the methodology is widely accepted. I didn't see any of that analysis in the opinion. And I struggle with that, because that's, and I agree with you, that's what the whole classification decision turned on was this theory of ambient harassment, and there's no foundation for it. Right, Your Honor. And I think the key to that is the ambient harassment in the district court's opinion. It seems to be, rather than coming straight from Dr. Fitzgerald's analysis of what actually happened in the Cook County Jail, which was excluded, it's more like coming from this idea that the court just essentially recognized that everybody who works in this jail has at least heard of this behavior. That this is the ambient harassment, that what they share is they all know of it, and they all perhaps could be subjected to it. And that turned into this basis, that turned into what they all share. And that's what we're really objecting to here. So, because the problem of inmate sexual harassment is far from uniform across the jail. The epicenter of the problem was always the maximum security male inmates. They live in Divisions 8, 9, and 10, which is essentially three buildings. The jail is 36 buildings large, nearly 100 acres. This court has recently recognized that it's the size of a small town. And within this small town, you have thousands of low security male detainees. You have female detainees. You have women in this class who worked with those. There are also women in this class who worked in other places, perimeter security, in the courtrooms, with the judges, those who worked in HR, employee discipline, employee drug testing. Your Honor, I think the key is when we look at the actual elements of a hostile workplace environment claim, and we look at the severity or pervasiveness element. It requires, based on the totality of the circumstances, which is here at jail, relatively unique circumstances, it requires that this severity or pervasiveness be very extreme, that it change the basic working conditions, that it cause psychological injury. And the idea that people move through the jail sometimes, so your primary assignment might be to work with female detainees, but you occasionally encounter male detainees, is leaving short of a common question as to severity or pervasiveness with someone who worked every day in the areas where those inmates actually live. Why wouldn't that be a matter of degree as opposed to whether it exists? So if you, for example, have someone who generally works at the courthouse, but she ends up doing shifts in Division 8 or Division 9, or one of the ones that I think you would agree is where the worst of the conduct alleged here takes place. Why wouldn't that be sufficient and just a matter of degree for that particular plaintiff as to how often or how severe it is for her? Your Honor, I think the key is in the context of a hostile work environment claim in particular, where the severity or pervasiveness has to be quite severe. Substantial differences in degree are a difference in kind. And I think that's really what it comes down to. There are both objective and subjective components. It has to actually alter the basic working conditions. And all we're really saying is those who worked every day with the maximum security male inmates have a different case for severity or pervasiveness than those who may have encountered them in a random overtime shift or encountered them in the hallway. Substantial differences in degree in the context of this sort of claim are a difference in kind. And so the defense expert here studied the incidents that happened in the jail, found that roughly 75% of these incidents were committed by those inmates, the maximum security male inmates. The plaintiff's expert disagreed, produced a chart that I think for our purposes shows basically the same thing, which is that the epicenter of the problem was the maximum security males. And it's important. The plaintiffs say at least some incidents happened everywhere. But it's important to note that only about a quarter of the class members here ever filed even the first complaint saying that they had been subject to this behavior. And so there's this huge variation in experience. And ambient harassment is the only way, essentially saying, well, what they all share is they've all heard of it. They all know of it. That's the only way to put them into this enormous class. And that's what we're saying was error. Mr. Fitzgerald, from the briefing here, there is quite a difference in your viewpoint and MIT's early viewpoint on what remains in the case in terms of ambient harassment. What's the status of the proceedings in the district court now? Are things stayed pending appeal, or is discovery ongoing? Well, Your Honor, I think the discovery period had already closed earlier in the case. For class, but had it closed for merits as well? I thought it had closed for class certification purposes, but that there were still some tie-ups for merits. I think there may be some, Your Honor. I'm not entirely sure. I guess what I'm getting at is, is this question of ambient harassment still being litigated or discovered at the district court level? Well, I think the way that the district court has it set up, it's still in the case as sort of a merits question. But I think that's exactly, I think that is an example of what the district court is getting wrong here, because I don't think ambient harassment is actually a merits question. I mean, if ambient harassment falls out, it's not that every single class member uniformly has no claim. It's just that they aren't a class anymore. They have different claims. You know, there may be women who worked here who wouldn't be relying in any sense on ambient harassment to bring their own claim. Is there ongoing expert discovery at the district court, or has that all been completed? I believe that has all been completed, Your Honor. If I'm wrong about that, I will update the court, perhaps in rebuttal. I'll make sure of that. Okay. 75%, Your Honor. 75%, excuse me. As a percentage of all the claims, how great is that? It's 75%, Your Honor, according to our expert. And the charts that show that are in the record, the appendix, page 37. They're competing charts from the defense and the plaintiff's expert. And what I'm saying is both of those charts show that the majority of these incidents were committed by this particular subset of inmates. You know, it's not even a majority of all of the inmates in the jail who reside in these three divisions, 8, 9, and 10. Yeah, but does the record reflect what percentage of jail personnel came in contact with that group? Your Honor, I don't think precisely it does, because common contact is an amorphous thing, and it's not totally certain who exactly came into contact with them overall. But what we're saying is it has to be much more than just occasional contact with them in order to share a common question about severity or pervasiveness. And that's particularly true in this jail context. You know, severity or pervasiveness must take into account the totality of the circumstances. That should include the fact that this is a jail. It should include the fact that the class members here, at least the corrections officers, have as their job the running of the jail and keeping the inmates in line. And so we have here a class of many corrections officers whose job is to prevent and stop this behavior, who are making this case about this exact behavior. And in all of this context, what it really comes down to is, is the baseline of what happens in a jail, can they show severity or pervasiveness on top of that? And what we're saying is they certainly can't do that all as 1,900 of them in a class. Even if they worked, say, with the female detainees or they worked with the low-security male detainees, who the records show, you know, incidents like this would happen something like once or twice a month with low-security male detainees. It's a vastly different experience in those places than in Divisions 8, 9, and 10. Well, is your position in a penal setting you could not ever consider ambient harassment? Our position is that ambient harassment can't ever be a justification standing alone for class certification. That there must be common experiences had by the class that go beyond ambient harassment, which is really just that they've heard of it and they're aware of what's happening. I mean, that's the extent of ambient harassment. It's almost by design this huge umbrella that covers a range of different actual experiences. Now, there's a second question here also that should be common in order to support this class but isn't. And that's the question of employer liability. In a case like this, employer liability comes down to the reasonableness of the actions by the Sheriff's Office. And there are two major issues with any finding of whether the Sheriff's Office was reasonable at once in one stroke for this entire class. One of them is that the responses of the Sheriff's Office to this problem are not uniform throughout the facility. There are all sorts of things that the Sheriff's Office did. The use of handcuffing to the extent that judges and public defenders objected. The use of special jumpsuits. The covering of windows and the covering of chuckles. These things were oriented around the people who actually committed these infractions and the areas where they live. But are the policies uniform? They may be employed differently depending on what area of the jail you're in. But are the policies that underlie this the same? There are absolutely some uniform policies throughout the jail, Your Honor. And I think that's true of any jail and probably 95% of all workplaces. There are some policies. And here, what those key common policies— But uniform—and I'm sorry to interrupt, Mr. Fitzgerald. I want to make sure I'm clear. Are there policies that go to the issue of addressing this sexual harassment by the inmates? Yes. The policies—so the common policies that we're talking about here, I think, are the policies that prohibited this behavior. The policies that required it be reported whenever it happened. And the structure of punishments that were doled out for this behavior. Those were common throughout the jail. But the second part of my point is even these common policies, it may not—it is not the same common question whether they're reasonable when the problem is vastly greater in some areas than another. So, for instance, if there's a very small fire, to use a fire extinguisher to put it out might be reasonable. If there's a huge fire, using the same fire extinguisher may not be reasonable. And the women who work in these different divisions with all these different types of inmates and who work perimeter security and these other places don't have the same common question. They're not asking the same question about whether the employer's response was reasonable. And that also should have precluded certification here. So, ultimately, it comes down to two questions that need to be common that are not common here across this huge class. That's severity or pervasiveness and employer liability. And the district court used ambient harassment to cover up these differences. Just the general walking around understanding of ambient harassment to cover up these differences and to say that this whole group could be a class, and that was error. If there are no further questions, I'll reserve the rest of my time. That's fine. Thank you. Thank you. Ms. Earley. Good morning, Your Honors. First, I'd just like to correct the record. Discovery is ongoing in the district court, and there is discovery with regard to experts. And so that continues. The evidence continues to be developed regarding the sexual harassment in this case. And, Ms. Earley, thank you for clarifying that. If I could pick up on a point, is that discovery focusing on ambient harassment? I am having a hard time figuring out from the court's ruling what part, if any, of ambient harassment remains in the case. In the court's initial certification ruling, the court relied very heavily on the theory of ambient harassment in order to certify the class, including for typicality, commonality, and predominance. And then in the subsequent hearing, the court says, well, I don't really have to decide. The class can be certified based on the narrowing of it without an ambient harassment theory. But the court doesn't go back into typicality, predominance, and explain how without the theory of ambient harassment. So I guess a double question for you. To what extent is ambient harassment still in the case? And that's why I asked, is it being focused on in discovery or expert discovery? And two, maybe you could start with this, what's the plaintiff's position on whether or not employees who could only prevail under a theory of ambient harassment are still in the case? First, there's no evidence that there are any class members who are only asserting the idea of ambient harassment. Let's assume if there were such evidence, what's the plaintiff's position on whether or not they would still remain in the case? They would, Your Honor, and here's why. Because this case is about the environment as a whole. It is one environment that impacts these women and the defendant's systemic failure to address that environment overall. What we're talking about here is an environment that, as a whole, alters the terms and conditions of employment for women. Women go to work each day here, and they are locked in with men who sexually attack women. They're basically sitting ducks, and there's a culture of fear. The record shows here that there are over 1,700 reported incidents of penises in the workplace, masturbation in the workplace, testicles being exposed in the workplace, ejaculation in the workplace, gender-based sexual slurs, violent rape threats. That happens, and the number in the record is over 1,700 reported incidents during a portion of the class period here. So what we're talking about is this environment, as described by this circuit in Allen v. International Truck, where there is the existence of what plant-wide animosity toward women that collectively constitutes one unlawful employment practice. How does the jail environment impact your theory? It's one thing to say if you're an employee and engaging in this type of conduct, and you can be fired. But another thing in the jail environment, when you're an inmate, and they can't kick you out. So how does the environment here impact your theory? First of all, the defendant's argument that this is a jail and that goes to the objective offensiveness of the workplace or to the reasonableness of their response under employer liability just shows that there's a common question on both of these issues. Be common proof about whether or not this changes the objective offensiveness of this workplace where penises are exposed and masturbation occurs on a regular basis. It would be a common question with common proof about whether the response was reasonable because it's a jail. Another thing is that there's no exception under Title IX for correctional institutions. And our expert reports put on at class certification show that there are standards that correctional institutions should employ. And there were systemic failures here to take those actions to prevent and stop this epidemic. It's epidemic described by the public defender of County of masturbatory attacks and penises in the workplace. So the assertion that this is a correctional institution and there are inmates and therefore Title VII doesn't apply or their commonality lacks is just simply wrong. It doesn't reflect the realities. This promise of Title VII extends to women who work in corrections. The other important point to remember here is that the district courts certified this class based on the question first of whether this was an objectively offensive work environment. That was the initial common question in the district court's opinion. It was early. That was the only common question that the judge addressed. And it was entirely based on this theory of ambient harassment, which lacks the foundation, as far as I can tell, in the judge's class certification order because the judge excluded the expert testimony on which it is based, at least insofar as it relates to the Cook County jail and then did not conduct a 702 analysis about the reliability of this psychological theory in order to rest the class certification decision on that common question. So I think that ambient harassment may not be the best way to describe. Yeah, I get that you're trying to put a different label on it in order to get around the fact that there is a foundation for it. But that is, in fact, what the judge based his decision on. And he never returned to that in the subsequent orders. He set the entire theory on which commonality rests, typicality, and predominance. And all he did in the subsequent orders is narrow the class members to exclude a few categories of job titles that it was later determined that those people in those positions don't have any contact with inmates. And so the foundation of the opinion, the rationale of the judge's class certification order rests on ambient harassment. So you can't just slap a different label on it and defend the decision. You have to defend the decision as it comes to us. One of the very first cases to address the theory of sexual harassment in 1971 from the Fifth Circuit, Rogers v. EEOC, is about ambient harassment, secondhand harassment, harassment that's not directed toward the plaintiff or the individual, but the environment. And in that case, there was a Latina woman who was bringing a sexual harassment, a racial harassment claim because she worked in an optician's office that segregated the patients. She wasn't being segregated based on her race or ethnicity. The patients were being segregated based on her race or ethnicity. And the Fifth Circuit said that it could readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers. And Title VII is aimed at eradicating these practices. And Rogers, from 1971, an ambient harassment case, if you will, was cited approvingly in the very first Supreme Court case to recognize the theory of sexual harassment. And that was in Meriter Savings Bank v. Vinson. So we're not talking about something novel here. The idea that the harassment, the environment could become so polluted that one environment, one unified collective environment creates plant-wide animosity. When you look at the totality of the circumstances, that is one unlawful employment practice that is a common question. So the district court did not err, did not abuse its discretion on this record, looking at the volume of masturbatory attacks, penises, testicles, ejaculation in the workplace, verbal sexual threats in the workplace, and finding that there were common questions here. The other important point to remember is that there were systemic failures by the defendant. The defendant's liability clearly is a common question. That is something the district court referred to, the issue of defendant's liability. And there will be common evidence that we would put on if this case is decertified. My colleagues and I represent over 400 women currently in the class, and we would likely represent more if the case is decertified. And we would have to put on the same evidence of the defendant's systemic failures to address this problem. Evidence of the common disciplinary policy, evidence that the defendants allowed reports of sexual harassment to expire so that those who were perpetrating the harassment got off scot-free. Evidence of systemic failures to handcuff, to have a policy about sexual harassment of inmates, sexual harassment by inmates of women. Common testimony by experts about what the standards are in a correctional institution. I want to move off of commonality for just a moment, please, and turn to the other requirements for class certification, in particular, typicality and predominance. In the district court's original certification ruling, the court relied heavily on the ambient theory, and almost exclusively on the ambient theory, in determining that there was typicality and predominance for purposes of class certification. Can you point to me, in the court's indicative ruling, where the court addresses the modified class, where an analysis of typicality and predominance is? I don't see where the court explains. And you're here on the class certification appeal, which we review for abuse of discretion. I don't see in the court's indicative ruling an analysis of typicality and predominance that we can review for abuse of discretion. So, Your Honor, it's my understanding, and I would have to get the pinpoint site for you later, that the indicative ruling refers back to the original class certification order and incorporates... that the original class certification order, for purposes of typicality and predominance, in particular. A lot for commonality, but I want to move beyond that, because the court did throw in that the basis for employer liability and the policies would be a common question in the indicative ruling. But you are correct that there's a reference back to the original certification order. But that original certification order relies really exclusively on the ambient theory for typicality and predominance, which the court subsequently says, well, I don't have to address whether or not that's in the case. So, other than the ambient theory in the original certification order, what do we have to look at for purposes of typicality and predominance in the class order that's up on appeal now? So, there's no separate discussion in the indicative ruling, Your Honor, about typicality or predominance. I will say that there are very important parts of the court's original order with regard to both typicality and predominance that go to ambient harassment, but also go to this record as a whole. Where? That's what I'm not seeing, and it sounds like you're saying in looking at this for abuse of discretion on typicality and predominance, the court didn't address that in the indicative ruling, which I agree with you, that we go back to the original certification ruling. Well, the original certification ruling really relied on the ambient theory for those two requirements of Rule 23, which in your briefing here is all about why we don't need that theory and why the court didn't rely on that theory for Rule 23 certification. So, I'm a little confused as to what we're supposed to review for those two requirements of Rule 23. So, let's talk about predominance because I do want to answer your question about that. The district court's decision found that predominance would not be an issue in this case. Defendants had pointed to subjectivity, the subjective element of whether this is a hostile work environment or not, and the district court took that into consideration and said that's really not an issue in this particular case, whether this was subjectively offensive or unwelcome. And the defendants had pointed to no evidence of welcomeness or the idea even that this could be subjectively not offensive. And I think that when you look at the record of over 1,700 incidents of indecent exposure of penises and masturbation in the workplace, and those are just the reported incidents we know we need to correct the argument by opposing counsel, we know there are more unreported incidents. So, and that is in the record as well, declarations by individuals who describe the harassment even if it was unreported. So, the district court said with regard to that subjective element, it's simply not going to predominate here. What's going to predominate is the systemic failure by the defendants to address this epidemic as a whole. But that's not what the court said in the certification order. The court said, you're right, the court was not persuaded by the defendants' argument that individual issues of damages or severity would prevail. The court says, and I'm looking at page 21 of the original order, where the court is specifically discussing predominance, that the court goes back to, as the court noted, however, the plaintiff's evidence of ambient harassment makes such class-wide resolution possible. And that's when talking about predominance. I don't see a separate analysis of predominance or a separate basis for predominance apart from the ambient harassment theory. So, again, ambient harassment theory goes to the idea that this is a harassing environment, one total hostile work environment as a whole that impacts women. I understand the theory, and I understand. I'm trying to get at reviewing what the basis of the district court's certification decision, given the change in the indicative ruling. And you have spent a lot of time, or maybe the majority of the time, you and the defendants going back and forth in the briefing about the class certification order not relying on an ambient theory. And it seems to me, based on the record, that the only thing that the court relied on for typicality and predominance is this theory of ambient harassment because the court did not engage in an analysis separate and apart from its original certification order and its indicative ruling on those two elements. So please correct me if I'm missing something or if there's something in the original certification order where the court, in addressing typicality and predominance, relies on something other than the ambient theory. Please show me where it is. You spent most of your brief talking about the commonality, but not those two other requirements which are necessary for class certification. So I don't think that it is an error or that the district court abused its discretion in using ambient harassment for either typicality or predominance on this particular record. But you argued in your briefs that the court didn't do that. So I'm just confused. I don't think that's what we argued in our briefs. We argued that the court didn't have to rely on ambient harassment on this record of extreme and egregious sexual harassment. But the court, as a separate and independent way to certify this class, could do so utilizing ambient harassment. Here what we have is not one isolated or sporadic incident, as Teamsters counsels us, but multiple incidents where it becomes the standard operating procedure to work in an environment where there is pervasive hostility towards women. It denies women access to the workplace. It denies women equal opportunity in the workplace. And if the court thinks that that is ambient harassment, that that theory ties everything together, it certainly was not error for the district court to do so on this particular record, given the egregiousness of the conduct. So there's plenty of evidence in the record that the plaintiffs, the class representatives' experience is typical. There's certainly evidence in the record that the issue of the environment as a whole, whether you call that ambient harassment or whether you call that objective offensiveness, which I think ambient harassment does go to the objective offensiveness, severity, and pervasiveness, that those are common questions that will be answered with common evidence about the environment as a whole. The focus here is not on one individual incident where a woman was traveling through her workplace and encountered a man masturbating. We're talking about hundreds, almost thousands of reported incidents. And I would venture to say there are more than thousands, definitely thousands of incidents. Ms. Earley, is it your position that once the district court judge found ambient pervasiveness throughout, that we shouldn't look to the Rule 23 requirements? We should just accept that he read those in to his overall finding? No, that's not my position, Your Honor. And I don't believe that the judge found that there was ambient harassment. The district court found that ambient harassment, whether ambient harassment, given this widespread sexual harassment, could constitute a severe pervasive environment was a common question. And so he did that under Rule 23a. He also, in his original order, which the indicative order refers to, goes through all the elements of Rule 23 and did not err in finding that those were met here. If I could ask you a second question with regard to ongoing discovery, could you be a little more specific in what is being sought in discovery at this time? Yes, Your Honor. I think at this time we are focusing on gathering more information about the environment as a whole. There's been depositions. There are ongoing depositions. There's a deposition tomorrow. There's also discovery with regard to the individual named plaintiffs. Apart from individual plaintiffs, I don't mean to set that aside, but is it your position you need more individual discovery for the issue of damages or for class? The additional discovery is just for merits overall. It is not for the purposes of class certification. We believe this record is sound for certifying the class. So you don't believe the judge is authorizing further discovery to speak to the class issue? The district court is not authorizing additional discovery on the class issue. This is simply on merits, Your Honor. So it's ongoing despite awaiting our ruling. Your discovery continues. Is that what's occurring? Yes, Your Honor. Thank you. All right. Thank you very much, Ms. Earley. Your time has expired. Mr. Fitzgerald. Thank you, Your Honor. Just a few points. To clarify and agree with Ms. Earley, discovery, fact discovery is ongoing. I think it closes February 26th. It is merits discovery, not oriented around class certification. There could be expert discovery after that. And I think what that's oriented around from the defense side is, you know, the risk that this class will be affirmed and that will be left with ambient harassment as a merits issue. And so we would fight and object to that that way. I think really, though, ambient harassment is a class certification issue. It is whether the class sticks together. It's not a merits question. And there's no question that there is a meaningful problem of inmate sexual misconduct in the jail. Counsel talked about 1,700 incidents. What I'm saying is of these 1,700 incidents, according to plaintiff's own expert, 1,200 of them are the maximum security male divisions, just three buildings. I'm out of 36 buildings in this jail. She says there may be other incidents that weren't reported. But I think it's important to note that it was required by the rules and the administrative code that this sort of incident be reported. And it's part of the job of the class members here, particularly the corrections officers who make up a lot of the class, to make these reports, to report these incidents whenever they happened and to move them forward for adjudication. And the sheriff's office always did that at a rate of at least about two thirds. So what we're talking about is from reported incident to an adjudication of guilty and punishment for that at a rate of no lower than about two thirds throughout this class period. Moreover, even if there is some underreporting of these incidents, underreporting of the incidents is just another wedge in the class here because the civilians who are within this class, hundreds of them, relied on the sworn officers within this class to make and put in these reports into the system. And so if they're saying one of the key problems here is an underreporting of this problem, it's basically half of the class blaming the other half of the class for not doing the reports. It's just another problem with the certification here. Now, additionally, our argument is not that Title VII does not apply in jails. We're not arguing that. What we're saying is the severity or pervasiveness element takes into account the totality of the circumstances and the baseline environment. And the baseline environment is that this jail is where people who have been unable to conform themselves to proper behavior in society are taken, particularly the maximum security areas. That it's the job of the class members here to address this behavior, to prevent it and stop it when it happens, and that in that context, a showing of severe or pervasive conduct is going to be particularly difficult for everyone. But as relevant here, it's going to be vastly different between those who worked with the maximum security males and the ones who worked, say, with female detainees or who worked in the courtrooms or who worked in HR or who worked in employee drug testing or employee discipline. Now, and the differences between these are oriented around, which brings me to the narrowing of the class that happened in the second round of certification here. This is a very minimal narrowing of the class. Essentially, who's taken out, it's a little confusing because it just refers to an exhibit and the exhibit has refers to a list within what the plaintiffs filed. But who's taken out basically is about 70 or 80 auditors from the records division. And the idea that these 70 or 80 auditors, basically office workers, buildings away from where the inmates are kept, any of the inmates are kept in this jail, just shows the overreach of the initial order. And the removal of this handful of people is far short of what needs to happen with regard to this class certification. Mr. Fitzgerald, you speak of the discovery that's ahead as merits. My concern is how do we find this baseline that you speak of? And that's why I was trying to make some inquiry of Ms. Earley. If the baseline would be helpful in determining commonality and the like. Your Honor, you mean the baseline? Will discovery speak to the baseline for the discovery? I think it will, Your Honor, because the jail, the sheriff's office with the class as it's currently certified is going to be stuck trying to make into a common question or deal with as a common question when it's really not a common question. What the baseline is in all these different parts of the jail that are so different. You know, and so female employees who work in the grand jury areas who may encounter the maximum security males, perhaps rarely or on occasion in the hallways, should have a different, they have a different everyday experience. And if one of them, so imagine a claim by just one person, because what a class is supposed to be is a whole bunch of people with just the same claim who can prove it basically the same way. But let's say a woman who works in the grand jury areas and her exposure to the maximum security males is sometimes when she walks in a hallway, she sees them when they're waiting for court. And she, maybe she has witnessed this behavior on rare occasion, maybe she's only heard of it. Her effort to show that in her workplace, there is an alteration of the basic conditions of her employment because of the severe and pervasive behavior around her is going to be a vastly different question than that of a woman who say was assigned to division nine and worked for months or years in a place where this behavior was happening every day. And that's our core point on class certification and it's ambient harassment as addressed by the district court on page 21 of the special appendix and its first order readdressed essentially and affirmed on page 36 and 37 of the special appendix when it goes back to it in the later order. That is what is holding this class together. There's no basic fact finding where the district judge said, I think everybody had basically the same experience. Instead it's, I think everybody had ambient harassment and there's a huge difference there. If the vast majority of this inmate behavior occurs in these three years, the division eight, nine, and 10, would a narrower class confined to the female employees who were assigned to work in those tiers survive scrutiny? Your honor, it may. I think it would have to be that such a class would be vastly smaller than the one we have now, which is the major concern to us. I think you're right that the arguments we're making are about the scope of the class more so than we're not saying it's impossible that there could be any class. But I think if you were looking at what would be more reasonable or closer to what would be common, it would be oriented around people who worked in these specific divisions. Perhaps those who filed at least one complaint of being targeted, at least the first complaint of being targeted. And that class would be many times smaller than the one that we're dealing with today. And just something totally counterfactual, but let's say hypothetically that as a response, the sheriff instituted a policy that only male officers would be assigned to these three tiers, divisions eight, nine, and 10, where the majority problem exists. Would that be a defensible, bona fide occupational qualification, sex-based? Your honor, I don't think so. I don't think that the sheriff can do that. Why not? The bona fide occupational qualification is very narrow. It's recently been addressed and it's been pointed out in the Supreme Court and other places how narrow it is. And I'm not aware that it has ever been used in the correctional context. Oh, it has. To protect guards from... I'm sorry, your honor. It has been. To protect guards from the inmates. Yes, it's been, that's been litigated. That sex-specific assignments in the correctional setting, if in certain contexts, depending on the condition, is a bona fide occupational qualification. Yes, your honor. And I think the exact cases that you're thinking of, the ones I'm aware of, are addressing male guards to protect the female inmates. And I think there's a meaningfully different situation when you're talking about protecting female guards, again, whose job it is to control this behavior by the male inmates. If you were going the opposite way and say the goal is protecting female guards from male inmates, I think it would be a much more difficult case. Yes, there are cases, and I think they're talking about female inmates and male guards, which I believe is different. Okay, thank you. Thank you. Thank you very much. Our thanks to both counsel. The case is taken under advice.